UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MRS. UNITED STATES NATIONAL PAGEANT, INC.,

                  Plaintiff,

v.

STEPHANIE L. WILLIAMS, CROWN GARLAND LLC,
and COSMOS INTERNATIONAL PAGEANTS, INC.,

                  Defendants.
_____

<u>DECISION AND ORDER</u>

18-CV-6587L

## **INTRODUCTION**

Plaintiff Mrs. United States National Pageant, Inc. ("plaintiff"), a producer of beauty pageants, brings this action against defendants Stephanie L. Williams ("Williams"), a former licensee of plaintiff, and two businesses operated by Williams, Crown Garland, LLC ("Crown Garland") (together with Williams, and for purposes of the current motion, "defendants") and Cosmos International Pageants, Inc. ("Cosmos"), alleging claims for, inter alia, trademark infringement, misappropriation of trademarks, breach of contract, and tortious interference with business relations. (Dkt. # 1).

Now before the Court is a motion by plaintiff for preliminary injunctive relief. (Dkt. #7). For the reasons that follow, that motion is denied.

## BACKGROUND

**I.     Facts**

Familiarity with the facts underlying this matter, summarized as follows, is presumed. Plaintiff is an organizer and producer of beauty pageants held throughout the country. (Dkt. # 7-2 at ¶ 3). In furtherance of its business, plaintiff owns nine Federally Registered trademarks, including Mrs. United States National Pageant, Mrs. United States, Little Miss United States, Miss Pre-Teen United States, Miss Junior Teen United States, Miss Teen United States, Miss United States, Ms. United States, and Ms. Woman United States (collectively, "plaintiff's trademarks"). (*Id.* at ¶¶ 4-5). Each of plaintiff's trademarks, with the exception of "Mrs. United States National Pageant," represents a different beauty pageant division in which contestants can compete annually at the local, state, and national levels. (*Id.* at ¶ 6).

Williams worked with plaintiff in various capacities from 2010 until July 2018. (Dkt. # 18-9 at ¶¶ 2, 4, 39). Of particular significance here is her role as national director for several of plaintiff's beauty pageant divisions. On November 16, 2016, plaintiff, as licensor, and through its president and executive director, Isabella Ilacqua, entered into an agreement with Williams, individually and on behalf of defendant Crown Garland, LLC, (the "2016 Agreement"), wherein plaintiff granted Williams an "exclusive, revocable, license" for the right to promote, finance, and produce national pageants for the divisions corresponding to the following seven of plaintiff's trademarks: Little Miss United States; Miss Pre-Teen United States; Miss Junior Teen United States; Miss Teen United States; Miss United States; Ms. United States; and Ms. Woman United States (collectively, "Miss United States Division"). (Dkt. # 7-11). The 2016 Agreement was for a term of two years. (*Id.* at 1-2).

On November 7, 2017, plaintiff entered into a similar licensing agreement with defendants, (the "2017 Agreement" and together with the 2016 Agreement, the "Licensing Agreements"), which granted defendants an "exclusive, revocable, license" for the right to promote, finance, and produce plaintiff's 2018 Mrs. United States National Pageant (the "Mrs. United States Division"). (Dkt. # 7-12). The terms of the 2017 Agreement expired on July 8, 2018, that is, "the day following the 2017/2018 National Pageant." (*Id.* at 1). Together, the Licensing Agreements made Williams the national director for all divisions of plaintiff's beauty pageants. (Dkt. # 18-9 at ¶ 6).

Among other things, the Licensing Agreements required the defendants, as licensee, to enter into separate contracts with individuals who would be responsible for conducting the state-level pageants ("State Directors"), with whom defendants were "solely responsible for retaining, managing, and communicating." (Dkt. ## 7-11 at 2; 7-12 at 2). The resulting state-level titleholders would then compete in the national-level competitions managed by defendants as licensee. (*Id.*). Williams alleges that the "production of the pageants was done solely at Crown Garland's expense, time and resources. [Plaintiff] did not contribute resources or materials to help with the production of the pageants throughout the duration of the [L]icensing [A]greements. Rather, [plaintiff] would simply collect monies owed under the terms of the [L]icensing [A]greements while [Williams and her] company . . . did all of the work and took all of the risk." (Dkt. # 18-9 at ¶ 7).

The relationship between the parties apparently began to erode leading up to the 2018 National Pageant. On May 24, 2018, Williams notified plaintiff of her intent to terminate the 2016 Agreement at the same time the 2017 Agreement was set to expire—July 8, 2018. (Dkt. # 7-13). Williams cited the "considerable[]" change in "working conditions," and "irreconcilable" differences between herself and Anthony Ilacqua ("Ilacqua"), plaintiff's director of operations and

the highest-ranking executive, as the reasons for the termination.[1] (*Id.*). Then, on June 28, 2018, in anticipation of the 2018 National Pageant, Williams's attorneys sent a cease and desist letter to Ilacqua, stating that "[b]ased upon the state of the current relationship between you and Ms. Williams, we respectfully request that you do not attend or attempt to interfere with any of the private pageant events planned and administered by [Crown Garland] for the time period of July 3, 2018 through July 7, 2018[.]" (Dkt. # 7-14 at 1).

Ultimately, Williams stopped working for plaintiff in July 2018, after the 2018 National Pageant. The circumstances surrounding her departure from plaintiff, including what she allegedly said to pageant contestants and State Directors during and after the 2018 National Pageant about their legal obligations to plaintiff or defendants, and who owns specific intellectual property, materials, and information created during the terms of the Licensing Agreements, are the principal matters in dispute.

## II.     Plaintiff's Motion for a Preliminary Injunction

As this Court has previously observed, the beauty pageant industry has long been a "crowded field," in which multiple entities, holding pageants that are similar in structure and appearance, often compete for the use and protection of similar trademarks. *Mrs. U.S. Nat'l Pageant, Inc. v. Miss U.S.A. Org., LLC*, 875 F. Supp. 2d 211, 227 (W.D.N.Y. 2012) (citing *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988)).

Plaintiff claims that defendants have misappropriated plaintiff's trademarks and breached the Licensing Agreements by converting and/or retaining certain intellectual property and other materials generated pursuant to the Licensing Agreements, and have tortiously interfered with

---

[1] Anthony Ilacqua is the son of plaintiff's president and executive director, Isabella Ilacqua.

plaintiff's business relations by making false representations to plaintiff's current and/or former State Directors and titleholders. Accordingly, plaintiff's current motion (Dkt. # 7), seeks an order enjoining defendants from making further use of the disputed materials, and ordering defendants to produce certain intellectual property, materials and information to plaintiff.

Specifically, plaintiff seeks to enjoin defendants from: (1) using plaintiff's trademarks; (2) using various websites containing plaintiff's trademarks; (3) using social media accounts as an administrator or editor "for all accounts which were originally created utilizing" plaintiff's trademarks; (4) using the contestant rolls for all of plaintiff's 2018 beauty pageant divisions; and (5) making disparaging remarks to plaintiff's current and/or former State Directors and titleholders, or any statements regarding such persons' legal obligations towards plaintiff. (Dkt. # 7 at 1-3).

Plaintiff also seeks an order directing defendants to return, transfer, or turn over to plaintiff: (1) administrative rights for all of the websites and social media accounts at issue; (2) documents that defendants created during the term of the Licensing Agreements utilizing plaintiff's trademarks; (3) the contestant rolls for all of plaintiff's 2018 beauty pageant divisions; and (4) all products, promotional material and/or advertising material bearing plaintiff's trademarks "and any other marks which are confusingly similar to or marks that are dilutive to or otherwise violate Plaintiff's Trademarks." (*Id.* at 3).

# DISCUSSION

## I. Legal Standard

"To obtain a preliminary injunction the moving party must show, first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions

going to the merits and a balance of hardships decidedly tipped in the movant's favor." *Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004). *See also Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995). The "'serious questions' prong is also frequently termed the 'fair ground for litigation' standard." *N.A.A.C.P., Inc. v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir. 1995).

The Court of Appeals for the Second Circuit has cautioned that, "[t]he showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction, and the moving party must show that injury is likely before the other requirements for an injunction will be considered." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal citations and quotations omitted). "To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. And, irreparable harm must be shown to be actual and imminent, not remote or speculative." *Id.* Where a plaintiff does not establish irreparable harm, the court need "not address the other factors necessary for the issuance" of injunctive relief. *See Rush v. Hillside Buffalo, LLC*, 314 F. Supp. 3d 477, 486 (W.D.N.Y. 2018); *see also Walters v. T & D Towing Corp.*, 2017 WL 1184169, *4 (E.D.N.Y. 2017) ("Because [p]laintiff has not demonstrated that she will suffer irreparable harm absent injunctive relief, the [c]ourt need not consider whether there is a likelihood of success on the merits of her claims.").

## II. Analysis

### A. Use and Control of Plaintiff's Trademarks, and Associated Websites and Social Media Accounts

Plaintiff acknowledges that defendants were "authorized to use Plaintiff's Trademarks in connection with their work" as plaintiff's licensee, in part to promote plaintiff's brand and recruit contestants for the beauty pageants. (Dkt. ## 7-2 at ¶ 55; 42 at 21). However, plaintiff argues that defendants, since the terms of the Licensing Agreements expired, "continu[e] to use Plaintiff's Trademarks on social media and websites to carry out commercial activities constituting competing pageants," which, in plaintiff's view, violates the Licensing Agreements. (*Id.*). Specifically, plaintiff relies on a provision found in both Licensing Agreements that states "[u]pon expiration or termination of this Agreement, any rights of National Director to the Licensed Trademarks and related names, logos, etc. shall immediately expire and terminate." (Dkt. ## 7-11 at 3; 7-12 at 3). In addition, plaintiff argues that a specific provision of the 2017 Agreement, which purportedly obligates defendants to relinquish control to the plaintiff over "intellectual property [including] all websites and social media relating to the [plaintiff's] brand or trademarks" at the conclusion of the 2017 Agreement, (Dkt. #7-12 at 3-4), applies to all of the websites and social media defendants created throughout the terms of the Licensing Agreements.

With regard to websites, Williams states that when she began working as national director for the Miss United States Divisions, "there were no websites given to [her] by [plaintiff] and [plaintiff] did not offer any websites for [her] to use." (Dkt. # 18-9 at ¶ 24). As a result, Williams claims that she, on behalf of Crown Garland, purchased several domain names "to field inquiries from contestants and promote [plaintiff's] national pageants," (*id.* at ¶ 25), only three of which are now at issue—www.missunitedstatespageants.com, [www.missunitedstatespageant.com](www.missunitedstatespageant.com), and

unitedstatesnationalpageants.com. According to Williams, once she stopped working for plaintiff, she "stopped using those domain names," and removed all content from them. (*Id.* at ¶¶ 28-30).

Plaintiff argues that the "fact that defendants utilized the[se] websites . . . makes them more valuable to [plaintiff] because these websites were listed in promotional materials and social media sites. The prospective customers will locate or link to these sites seeking to sign up with [plaintiff] as contestants." (Dkt. # 21-4 at ¶ 20). Plaintiff urges that injunctive relief is necessary because "[f]or every day that [plaintiff] is not in possession or control of the[se] websites . . . [plaintiff] is losing out on prospective customers who would have paid to sign up as contestants in [plaintiff's] ongoing pageants." (*Id.* at ¶ 21).

Plaintiff has not shown irreparable harm as it relates to these three websites. Initially, plaintiff has not shown that defendants are currently utilizing plaintiff's trademarks for the websites. Throughout defendants' opposition papers and oral argument, defendants have represented that since the conclusion of the 2018 National Pageant, the above-three websites have not been active and are "void of any content." (Dkt. # 18-9 at ¶ 28-30). In the absence of active websites with any content referencing plaintiff's trademarks, then, it is hard to fathom how defendants are causing irreparable harm by using the websites, as plaintiff argues, "to carry out commercial activities constituting competing pageants."

Moreover, plaintiff has not shown that any other harm caused by defendants' ownership of the websites, for example, the loss of unidentified prospective customers who, apparently, "would have paid" to sign up as contestants, constitutes irreparable injury. First, this claim is entirely speculative: plaintiff has produced no evidence that any prospective contestants or customers of plaintiff have been or are likely to be diverted to competing pageants, or discouraged from participating in one of plaintiff's pageants, by visiting the subject websites. The websites are

devoid of content, are not equipped to divert any potential contestants seeking to contact plaintiff, and do not interfere in any obvious way with plaintiff's ongoing promotion or production of its pageants. In fact, there is no dispute that plaintiff retains—and is currently exercising—the unfettered ability to promote and sign up potential contestants through its official website, www.mrsunitedstates.com.[2] Furthermore, defendants have submitted evidence showing that plaintiff's current State Directors currently have the means to promote plaintiff's pageants, and that state-level pageant competitions are still occurring. (Dkt. # 18-9 at ¶ 43).

In the Court's view, then, plaintiff's alleged harm related to the websites at issue can either be compensated by money damages, or is speculative, neither of which is sufficient to establish irreparable harm. *See Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) ("[m]ere injuries, however substantial, in terms of money, time and energy . . . are not enough" for injunctive relief) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)); *see also Sunni, LLC v. Edible Arrangements, Inc.*, 2014 WL 1226210, *9 (S.D.N.Y. 2014) ("a plaintiff must demonstrate that the injury alleged to be irreparable is actual and imminent, not merely possible") (citing *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)), *reconsideration denied* 2014 WL 1327880 (S.D.N.Y. 2014).

For similar reasons, plaintiff has failed to demonstrate a likelihood of irreparable harm arising from defendants' ownership or administration of social media accounts. Plaintiff argues that social media accounts formerly used by Williams and some of her former State Directors to promote plaintiff's pageants have, since the 2018 National Pageant, been converted to accounts promoting the Cosmos International Pageant—Williams's new pageant company—some of which

---

[2] Indeed, a simple Google search for plaintiff's pageants brings you to plaintiff's official website, https://www.mrsunitedstates.com, which has always been controlled exclusively by plaintiff, and it is the top online search engine result for all of its pageants.

continue to reference plaintiff's trademarks. (Dkt. # 7-2 at ¶¶ 55-58). By doing this, plaintiff contends, defendants have "stolen access to potential customers and future contestants from [plaintiff's] brand," (*id.* at ¶ 57), and caused plaintiff to lose "followers" on social media. This, in turn, has caused plaintiff to lose contact lists and promotional abilities through social media. (*Id.* at ¶ 59). Moreover, plaintiff argues, the conversion of these sites has created "customer confusion as a matter of law[.]" (Dkt. # 7-42 at 26).[3]

Williams states that she created social media accounts in the fall of 2015 for Facebook, Twitter, and Snapchat for the Miss United States Divisions because no social media pages existed for those seven divisions. (Dkt. # 18-9 at ¶ 39). According to Williams, social media already existed for the Mrs. United States Division, but she apparently was not given access to those platforms by plaintiff. (*Id.*).

Significantly, as with the websites at issue, Williams states that when she left her role as National Director of plaintiff in July 2018, she "either deactivated each of these accounts or removed all content relating to [plaintiff's] brand, including all trademarked titles." (*Id.* at ¶ 39). In any event, she states, "all social media accounts [her] company and [her] had control over and utilized during [her] role as National Director for [plaintiff] (that [she] is aware of) were unpublished by the end of July 2018. [Williams] ha[s] created all new social media platforms <u>from scratch</u> for [her] Cosmos Pageant." (*Id.* at ¶ 40) (emphasis in original).

---

[3] In support of the argument that customers are confused by the conversion of these social media accounts, plaintiff submits now-Cosmos social media accounts, for example, that still reference "Ms. Woman Tennessee United States and Miss Tennessee United States"—references, it seems, to plaintiff's pageants and trademarks. (Dkt. # 7-38 at 4). Another Facebook page shows an advertisement for Cosmos, with a message from a follower on July 19, 2018: "Did this take the place of Miss United States? I noticed it will be held during the same time at the same place." (*Id.* at 7). Furthermore, a follower commented on another Miss Cosmos United States Pageant advertisement on Facebook, "Is this still a United States [National Pageant] affiliation?" (*Id.* at 13). Williams, among others, explained in subsequent comments that it was not. (*Id.*).

Williams avers that if there are social media platforms which contain references to plaintiff's trademarks or pageants, "those platforms are not under [her] control (i.e., social media platforms owned and operated by state directors) and therefore, [she] ha[s] no way to access or change them. However, with respect to any state directors who formerly contracted with Crown Garland that now work for Cosmos, [her] company has asked them to remove, to the extent possible, any reference to [plaintiff] or its trademarks or logos from their websites and social media pages." (*Id.* at ¶ 41).[4]

In short, there is no evidence that defendants are presently making use of any of plaintiff's trademarks in connection with any social media accounts that are under their control. As mentioned above, defendants claim that after the July 2018 National Pageant, they removed all content related to plaintiff's trademarks from all social media accounts that they owned, administered or controlled, and plaintiff has produced no evidence to the contrary. Moreover, defendants have submitted evidence showing that plaintiff's new State Directors "have already established their own social media pages to promote their state pageants." (Dkt. # 18-9 at ¶ 43). Therefore, it does not appear that plaintiff has been harmed except by the need to spend the "money, time and energy" in creating new social media accounts to advertise its brand, which is not sufficient to show irreparable harm. *See Jayaraj*, 66 F.3d at 39. Moreover, the removal of

---

[4] Defendants also draw a distinction between the purported obligations contained in the 2016 and 2017 Licensing Agreements. Williams argues that she is "no longer utilizing these social media platforms, but there is nothing in the 2016 Agreement that requires [her] to turn them over to Mr. Ilacqua." (*Id.* at ¶ 47). As it relates to the "Mrs. United States Division" and the 2017 Agreement, Williams asserts that she "never had access to any of the domain names, websites or other social media platforms for that division. . . . In other words, [she] ha[s] no websites or social media to return pursuant to the 2017 Agreement." (*Id.* at ¶ 48). Plaintiff disputes this interpretation of the Licensing Agreements.

11

plaintiff's trademarks and information from the accounts under defendants' control has vitiated the risk of any confusion on the part of consumers.[5]

Although plaintiff argues, and has submitted evidence to suggest, that some vestigial links or references to its prior pageants nonetheless remain on social media accounts controlled or administered by its former State Directors (*see supra*, footnote 2), there is no evidence that defendants have any control over those accounts, and defendants have submitted evidence that they have instructed all persons within their control to remove any potentially infringing materials from their social media accounts.

To the extent that plaintiff claims that it has lost social media "followers" due to the defendants' removal of plaintiffs' trademarks and other information from certain accounts which defendants, who created and administered the accounts, allegedly thereafter converted to Cosmos pages, plaintiff has failed to show how that loss poses a danger of irreparable harm. Not only has plaintiff failed to cite any authority for that proposition, but, again, defendants have represented that they removed any reference to plaintiff's trademarks on accounts under their control. Furthermore, as mentioned above, plaintiff retains its official website for advertising and contestant sign-up, and plaintiff and its new State Directors have already begun to create, administer and gain social media followers through its official website, as well as other sites and social media accounts using plaintiff's trademarks.[6]

In sum, while the 2017 Licensing Agreement does, on its face, appear to obligate defendants to relinquish control to the plaintiff over "intellectual property [including] all websites

---

[5] "Even assuming that potential customers would likely be confused [by the] websites, a likelihood of confusion does not create a presumption of irreparable injury." *Ardis Health, LLC v. Nankivell*, 2011 WL 4965172, *5 (S.D.N.Y. 2011) (internal quotations omitted).

[6] For example, as of February 7, 2019, the official "Mrs. United States Pageant" Facebook page administered by the plaintiffs has over 8,500 followers.

and social media relating to the [plaintiff's] brand or trademarks" at the conclusion of its terms, (Dkt. #7-12 at 3-4), the exact scope and application of which is currently in dispute, there is simply no convincing proof of irreparable harm arising from the defendants' retention of those items at present. As such, disposition of plaintiff's trademark and contract claims on the merits must await dispositive motions and/or trial.

> B. **Use of Plaintiff's Contestant Rolls for 2018 Pageants, and Retention of Pageant-Related Information and Materials Used during the Terms of the Licensing Agreements**

Plaintiff, based on its interpretation of the Licensing Agreements, seeks to enjoin defendants from using, and an order requiring the return or, a host of other physical and electronic material created for plaintiff's 2018 pageants. This includes files, forms, and databases, specifically including "financial records, logos, promotional items, marketing materials, program books, video recordings, and contracts entered during the term of the [Licensing Agreements], [and] contracts with State Directors, titleholders, sponsors, suppliers, and hotels[.]" (Dkt. # 7-2 at ¶ 72(A)). Plaintiff also seeks the contestant rolls for its 2018 pageants, which contain names and contact information for former contestants (and in the case of minor contestants, for their parents or guardians). (*Id.* at ¶ 72(B)).

Defendants again draw a distinction between the purported obligations of the 2016 Agreement and the 2017 Agreement. In defendants' view, nothing in the 2016 Agreement requires them to turn over the above-referenced materials to plaintiff. (Dkt. # 18-9 at ¶ 56). Defendants also claim that, to the extent the 2017 Agreement requires the turnover of certain materials, they have already given plaintiff some of this information, such as program books (*id.* at ¶ 57), contestant rolls (*id* at ¶ 58), and scoresheets for the competitions (*id* at ¶ 59). To the extent information has not been returned, such as judges' books and auditors' books, defendants argue

that those items were created exclusively for Crown Garland, and constitute Crown Garland's proprietary information, which do not need to be returned to plaintiff. (*Id* at ¶¶ 61-62).

The Court does not believe plaintiff has made a showing of irreparable harm as it relates to the above-referenced materials. There is no proof that defendants are making any improper use of contestant rolls. Plaintiff has also failed to prove that defendants' present possession of any remaining marketing materials, contracts or other documents related to defendants' performance of its obligations under the Licensing Agreements, and/or judges' books from the 2018 National Pageant is causing irreparable harm to plaintiff in a manner not fully compensable through an award of money damages. As stated above, then, these contractual disputes must await further discovery and dispositive motions and/or trial.

In the absence of demonstrated irreparable harm, preliminary injunction relief is not appropriate relative to these items.

## C. Statements to Current or Former State Directors and Titleholders of Plaintiff

Plaintiff claims that defendants have engaged in tortious interference with business relations, by making false and misleading communications to current and/or former State Directors, causing plaintiff "to expend significant resources" to recruit, sign and train new State Directors to replace those seven State Directors that defendants allegedly enticed to leave Plaintiff's employ. (Dkt. # 7-2 at ¶¶ 43-51). According to plaintiff, defendants' actions "also caused [plaintiff] the loss of substantial goodwill and continuity of its directors, which has a significant impact on [plaintiff] as [the beauty pageant] industry is largely reputation driven." (*Id.* at ¶ 51). Plaintiff also alleges that defendants made false and misleading statements to at least one pageant titleholder, which caused her to violate her titleholder agreement by competing in a pageant not produced by plaintiff. (*Id.* at ¶ 53-54). Plaintiff asks the Court to enjoin the defendants

from making additional statements to plaintiff's State Directors and/or titleholders, concerning plaintiff and/or their legal obligations to plaintiff.

Plaintiff's claim of loss of reputation and goodwill is based only on Ilaqua's conclusory statement in his declaration. (*Id.* at ¶ 51). Without more, this is insufficient to show irreparable harm. *See Rush*, 314 F. Supp. 3d at 486 ("In failing to supply evidence of the loss of reputation or good will beyond his own conclusory averments, [p]laintiff has not made a sufficient showing that irreparable harm is likely at this point in the action."). Moreover, plaintiff appears to have already mitigated any harms already incurred by replacing the former State Directors, and has continued to produce pageants per its usual annual schedule. In any event, plaintiff has not demonstrated that money damages would be inadequate to compensate it for its expenditure of "significant resources" in recruiting, signing, and training new State Directors. *See Jayaraj*, 66 F.3d at 39 ("[m]ere injuries, however substantial, in terms of money, time and energy . . . are not enough" for injunctive relief). As a result, those allegations do not constitute irreparable harm.

## **CONCLUSION**

For the foregoing reasons, I find that plaintiff has failed to demonstrate that irreparable harm will follow if a preliminary injunction is not granted, and/or that the claims plaintiff alleges in this action are not, if proven, fully compensable with an award of monetary damages. Plaintiff's motion for preliminary injunctive relief (Dkt. #7) is therefore denied. This Court having heard oral argument on the instant motion on October 3, 2018, the plaintiff's motion requesting an expedited hearing (Dkt. #8) is denied as moot.

Based on the Court's review of the pleadings and record, it appears that mediation is appropriate, and, therefore, I order the case to mediation. *See* Alternative Dispute Resolution Plan

("ADR Plan"), effective May 11, 2018, Rule 2.1(B). Much potentially expensive litigation could be obviated by a meeting with a mediator to discuss outstanding issues and document requests. The parties are directed to seek accord on a mediator pursuant to the ADR Plan, within 21 days of entry of this Decision and Order. The parties should notify the Court as to the identity of the selected mediator. If the parties fail to timely select a mediator, this Court will promptly appoint one.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
February 14, 2019.